# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOSE LUIS SANTOS,

        Plaintiff,

  -vs-                                    Case No.   13-cv-606

MICHAEL BAENEN,
PETER GAVIN,
BENJAMIN GRIFFEN,
CRAIG NEMETZ,
MARTY BREEN, and
JEAN LUTSEY,

        Defendants.

## DECISION AND ORDER

The plaintiff, Jose Luis Santos, who is incarcerated at Green Bay Correctional Institution, filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that his civil rights were violated. This matter comes before the Court on the plaintiff's motion for leave to proceed *in forma pauperis*, the plaintiff's motion to appoint counsel, and for screening of the plaintiff's complaint.

The plaintiff has been assessed and paid an initial partial filing fee of $1.67, and has paid a total of $13.67 towards his filing fee in this case. His motion for leave to proceed *in forma pauperis* will be granted.

The Court is required to screen complaints brought by prisoners seeking relief

against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not necessary for the plaintiff to plead specific facts and his statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, a complaint that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, courts should follow the

principles set forth in *Twombly* by first, "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Legal conclusions must be supported by factual allegations. *Id.* If there are well-pleaded factual allegations, the court must, second, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The court is obliged to give the plaintiff's *pro se* allegations, "however inartfully pleaded," a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## I. COMPLAINT AVERMENTS

On January 9, 2013, the plaintiff was eating lunch. Either CO Nemetz or CO Follmer handed the plaintiff his tray with apple sauce, hamburger, bun, cheese, and potato. The plaintiff started making his hamburger by putting the onions and pickles on it. The plaintiff took four or five bites until he noticed a crunch and then two more crunches. The plaintiff open his mouth and spit out a razor blade and blood. The plaintiff screamed for the correctional officers several times right after he found the razor blade in his food. The

3

plaintiff pressed his health button and CO Kyler answered his call. The plaintiff told Kyler, "There was a razor blade in my hamburger and I want to see a white shirt, H.S.U., and I want pictures taken right now." (Complaint at 3). Kyler told the plaintiff to talk to his wing officer, but the plaintiff responded, "He's gone. I'm not playing." (Complaint at 10).

Nemetz came back and asked the plaintiff give his tray up, but the plaintiff told him no. He wanted to see a white shirt and have pictures taken first. After some time, Nemetz came back with a short digital camera and took six pictures, two of the plaintiff's mouth, two of the tray with the razor blade on it, and two of the plaintiff's tray with the blood mixed with the chewed up food. Nemetz told the plaintiff to place the razor blade in a plastic bag, saying that it along with the pictures would be evidence and that he (Nemetz) was going to be the one to file a report. The plaintiff repeatedly asked for a white shirt, but they refused to summon someone. Nemetz left with all the evidence. The plaintiff screamed behind him that he needed the health services unit (HSU).

CO Griffin took the plaintiff's call on the health intercom. Griffin asked if the plaintiff had said earlier that he had a razor blade in his room and was going to use it to kill himself. Griffin and the plaintiff disagreed about that, raised their voices, and ultimately the plaintiff called Griffin a liar and said, "Come get me!" (Complaint at 4).

Griffin and Nemetz arrived at the plaintiff's cell, and the plaintiff thought they were going to put him in observation. Instead, they were taking the plaintiff to HSU. Plaintiff asked who was working and told the officers that Jean Lutsey does not like him.

4

The officers told the plaintiff that Lutsey was working but that it would be a refusal if he did not see her. The plaintiff was warned that he would be responsible for a $7.50 copay to see the nurse.

In the HSU, Lutsey examined the plaintiff. She used a flashlight to look in the plaintiff's mouth and said, "Everything fine I don't see nothen." (Complaint at 4). The plaintiff wondered how that was possible because he could feel the cuts in his mouth and the burn and sting. She told him they were white dots and were nothing major. She offered him salt packets for the stinging. Lutsey asked the plaintiff to sign the co-pay slip, and he said he would because he would need it for his documents that he came to see Lutsey and she did not help him. Lutsey responded that it would not help him.

On the way back to his cell, the plaintiff exchanged words with Nemetz. In his cell, the plaintiff held onto his tray and again asked to talk to a white shirt. The officers said no and walked away. They left the plaintiff handcuffed to the door. Five minutes later, C.O. Follmer came and asked the plaintiff why he was holding his tray top and told him a white shirt was on the way. Follmer told the plaintiff that he had seen the razor blade on his tray. The plaintiff finally gave up his tray and was disconnected from the door with a promise that a white shirt would come to see him.

The plaintiff waited and waited, but no white shirt came. The plaintiff pressed his health button numerous times with no result and then flooded his cell. "Still no white shirt came." (Complaint at 5). The plaintiff stopped Nemetz during his rounds and found

5

out the second shift took over in twenty minutes. On second shift, the plaintiff was informed that a white shirt named Lt. Gavin was "on the tear." *Id.* The plaintiff called for Lt. Gavin, and he finally came to the plaintiff's door. They had a heated verbal exchange that included Lt. Gavin telling the plaintiff he would need to write to records for the incident report and pictures. Lt. Gavin relied on Lutsey's conclusion that the plaintiff was fine. The plaintiff asked to see another nurse, but his request was denied. The plaintiff told Lt. Gavin that he was writing everybody up because they did not want to help him.

The plaintiff put in a "green slip" to the psychological services unit (PSU) to see his psychologist, Dr. Marty Breen, regarding his past history with trust and being locked up, especially after finding the razor blade and "almost avoiding death." (Complaint at 7). On or about January 17, 2013, the plaintiff was pulled out of his cell for an appointment with Breen. Breen suggested in a gentle way that the plaintiff was lying about the razor blade in his food and insisted that no one at the prison was trying to kill the plaintiff. Breen told the plaintiff that he had a very strong imagination and that she could prescribe him medication due to his delusions. She also asked the plaintiff if he was trying to get transferred to the Wisconsin Secure Program Facility (WSPF). The plaintiff said that he wanted to be transferred, but Breen told him she would guarantee that he would not get there acting like he currently is, fixated on the razor blade incident. The plaintiff became uncomfortable with the conversation and stopped answering her questions. In the end, Breen said she would put in her comments about the transfer to WSPF and that the plaintiff would have to wait for

6

Breen's supervisor to approve it. The plaintiff filed an inmate complaint about this meeting.

While the plaintiff was waiting for a response to his inmate complaint, he wrote again on January 24, 2013, about a conversation he had with Breen while she was on her rounds. The plaintiff alleges that PSU was helping to cover up the razor blade incident and trying to "bribe" the plaintiff to drop the issue. (Complaint at 8). On her rounds, Breen stopped by the plaintiff's cell and talked to him further about the razor blade incident. She mentioned that she had talked to Lutsey. Breen told the plaintiff to remember that she did not want to put him on medication for being delusional and said that she had not yet approved the plaintiff's transfer to WSPF. She indicated that she would approve the transfer if he dropped the razor blade incident.

The plaintiff does not have all of the incident reports, investigation reports, or pictures. He submits that Warden Baenen will not let him have them. The plaintiff was told that he had to pay for the copies or get a court order.

The plaintiff asserts that he continues to suffer as he pursues the case of negligence, malpractice, cruel and unusual punishment, pain and suffering, mental anguish, and deliberate indifference, all of which violate the plaintiff's rights under the Eighth and Fourteenth Amendments.

## II. DISCUSSION

This complaint is not about how the razor blade got into the plaintiff's food. This complaint is about how the plaintiff was treated after he reported the incident. The

plaintiff uses the word negligent over and over. He does not say that the razor blade was placed in his food intentionally or, if it was, that it was done by any of the defendants. Rather, he complains about how they handled the situation after the razor blade was discovered. The Court will consider the plaintiff's claims against each defendant.

First, the plaintiff suggests that Lutsey denied him adequate medical care. However, she examined him in the HSU. She used a flashlight to look in his mouth, observed that there were no visible cuts, and recommended course of action (even if it wasn't the treatment plaintiff wanted). Lutsey's actions do not suggest deliberate indifference to a serious medical need. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Estelle*, 429 U.S. at 104).

Second, the plaintiff submits that defendants Griffen, Gavin, and Nemetz denied the plaintiff additional medical care and failed to thoroughly investigate how the razor blade ended up in the plaintiff's food. The narrative in the plaintiff's complaint describes officers responding professionally and appropriately to the situation. They took pictures of the razor blade and the food. They filed a claim for the plaintiff. They took the plaintiff to the HSU for medical treatment. And ultimately a "white shirt" came to talk to the plaintiff about the incident, even if he did not come as quickly as the plaintiff wanted. These actions do not state a claim for a violation of the plaintiff's constitutional rights.

Third, the plaintiff asserts that Breen denied the plaintiff adequate mental health care. He suggests a kind of reverse retaliation by Breen. However, according to the

8

plaintiff's complaint, Breen treated the plaintiff for his mental health needs, offered him medication and suggested a transfer. She may have believed the plaintiff was delusional and possibly fixated on this razor blade incident, but her handling of the plaintiff does not evince deliberate indifference to the plaintiff's serious mental health needs, even at this screening stage. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001)

Fourth, the plaintiff names Warden Michael Baenen as a defendant. The only mention of Baenen in the body of the complaint is that he was involved in the plaintiff's exhaustion of his administrative remedies and that he denied the plaintiff copies without payment or a court order. Ruling against a prisoner on an administrative complaint does not constitute a constitutional violation. *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007). "One can imagine a complaint examiner doing her appointed tasks with deliberate indifference to the risks imposed on prisoners. If, for example, a complaint examine routinely sent each grievance to the shredder without reading it, that might be a ground of liability. Or a complaint examiner who intervened to prevent the medical unit from delivering needed care might be thought liable." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (citations omitted). The plaintiff's complaint contains no allegations that Baenen was deliberately indifferent in the handling of the plaintiff's inmate complaint. Also, there is nothing unconstitutional about a policy requiring an inmate to pay for copies of records if there is no court order directing the institution to provide the copies for free.

Because all of the plaintiff's claims are being dismissed, his motions to appoint

9

counsel and for a temporary restraining order will be denied as moot.

### III.  ORDER

**IT IS THEREFORE ORDERED** that the plaintiff's motion for leave to proceed *in forma pauperis* (Docket #2) is **granted**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to appoint counsel (Docket #4) is **denied as moot**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for a temporary restraining order (Docket #11) is **denied as moot**.

**IT IS FURTHER ORDERED** that this action be and hereby is **dismissed** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1) for failure to state a claim.

**IT IS FURTHER ORDERED** that the Clerk of Court document that this inmate has brought an action that was dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

**IT IS FURTHER ORDERED** that the Clerk of Court document that this inmate has incurred a "strike" under 28 U.S.C. §1915(g).

**IT IS FURTHER ORDERED** that the Secretary of the Wisconsin Department of Corrections or his designee shall collect from the plaintiff's prison trust account the $336.33 balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time the amount

in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**IT IS ALSO ORDERED** that copies of this order be sent to the warden of the institution where the inmate is confined.

**I FURTHER CERTIFY** that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3) unless the plaintiff offers bonafide arguments supporting his appeal.

Dated at Milwaukee, Wisconsin, this 20th day of February, 2014.

**SO ORDERED,**

*/s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**U. S. District Judge**